UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
ALONSO MYERS,                          :        04 Civ. 00543 (JCF)
                                       :
                Plaintiff,             :            OPINION
                                       :            AND ORDER
        - against -                    :
                                       :
NEW YORK CITY HUMAN RIGHTS             :
COMMISSION,                            :
                                       :
                Defendant.             :
- - - - - - - - - - - - - - - - - - -:
JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Alonso Myers brings this employment discrimination action pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12111, et seq. (the "ADA"), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. ("Title VII"). He alleges that his employer, the New York City Human Rights Commission (the "Commission"), discriminated against him on the basis of disability and race. The defendant now moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The parties have consented to referral of this case to me for all purposes, including determination of dispositive motions, pursuant to 28 U.S.C. § 636(c). For the reasons that follow, the defendant's motion is granted.

Background

Alonso Myers is an African American and Native American man employed by the Law Enforcement Bureau of the Commission. (Complaint submitted to the Equal Employment Opportunity Commission

1

("EEOC Complaint") dated July 9, 2003, attached as Exhibit A to Declaration of Amy Rothschild ("Rothschild Decl.") dated August 15, 2005; Defendant's Statement Pursuant to Local Rule 56.1 ("Def. 56.1 Statement"), ¶ 3).  Mr. Myers has held his current position as a Human Rights Specialist since August 8, 1994.  (Def. 56.1 Statement, ¶ 3).  In this capacity, he evaluates formal discrimination complaints filed by members of the public, and the evaluation process often requires him to meet with the complainants.  (Def. 56.1 Statement, ¶ 4).

A.   Conflicts with a Co-Worker and the Subsequent Relocation

Mr. Myers has a history of conflicts with a co-worker, Ms. Sol Rivera.  The plaintiff complained to the Commission that in February or March 2002 Ms. Rivera pushed her way past him when he unlocked a door to the Commission's offices.  (Def. 56.1 Statement, ¶ 7;  Affidavit of Alonso Myers dated Sept. 27, 2005 ("Myers Aff."), ¶ 5).  On April 16, 2002, the plaintiff and Ms. Rivera had an altercation involving physical contact.  (Def. Exh. F;[1] Declaration of Clifford Mulqueen, Deputy Commissioner for investigations and General Counsel for the Commission ("Mulqueen Decl."), ¶ 6).  The plaintiff alleges that on this occasion he heard someone mumbling behind him as he was walking down the hallway, and, when he turned around, Ms. Rivera pushed him out of the way and declared that he was behaving rudely.  (Def. 56.1

_____

[1]  "Def. Exh." refers to exhibits attached to Rothschild Decl.

Statement ¶¶ 6-7; Def. Exh. F; Myers Aff., ¶ 5).  The Commission reports that, according to Ms. Rivera, the plaintiff deliberately struck her without provocation as she was passing him in the hall. (Mulqueen Decl., ¶ 7).

On April 17, 2002, Deputy Commissioner Clifford Mulqueen spoke with Mr. Myers about the incident of the previous day.  (Myers Aff., ¶ 5).  According to the plaintiff, Mr. Mulqueen asked if the two co-workers had "ha[d] words," and the plaintiff responded in the negative.  (Myers Aff., ¶ 6).  Mr. Mulqueen then instructed the plaintiff to move from his workspace on the ninth floor to the tenth floor.  (Myers Aff., ¶ 6; Mulqueen Decl., ¶ 8).  The plaintiff alleges he was then prevented from meeting with complainants until October 2002.[2]  (Myers Aff., ¶ 3).  The Commission does not deny that Mr. Mulqueen directed Mr. Myers to move to the tenth floor.  (Mulqueen Decl., ¶ 8).  It maintains that the purpose of this relocation was to separate him from Ms. Rivera. (Mulqueen Decl., ¶ 9).

Based on a complaint by Ms. Rivera regarding the incident of April 16, 2002, the Commission brought a charge of misconduct against the plaintiff the next day and notified him that an

_____

[2] Mr. Myers indicates that he was permitted to meet with complainants after October 2002 but alleges that he was required to remain on the tenth floor until October 2003.  (Myers Aff., ¶¶ 3, 20).  It is not clear whether the discrepancy in dates represents a typographical error or a decision by the Commission to allow for Mr. Myers to meet with complainants at his tenth floor workstation from October 2002 to October 2003.

informal conference would be held. (Def. Exh. D). On April 18, Mr. Myers served his answer, in which he alleged that the Commission exhibited a failure "to obtain facts, and to have such facts objectively weighed," but he made no allegations of racial bias against the Commission. (Def. Exh. E). The plaintiff attended the April 26, 2002, informal conference and was represented by a union official. (Def. Exh. G). On May 13, 2002, the Informal Conference Leader issued a decision, finding the charges unsubstantiated:

> The fact that you were wearing an earplug on the day in question greatly undercuts the allegations. While there appears [sic] to be some issues between you and Ms. Rivera, the conference did not reveal any evidence to support the allegations stated in the Charges. It appears that there is a definite misunderstanding of what occurred. Given the events of the day, Ms. Rivera's emotional state and your impaired hearing ability, the physical contact between Ms. Rivera and yourself appears to have been accidental.

(Def. Exh. G). Although the formal charges were dismissed, the Commission required the plaintiff to remain at his tenth floor workstation until October 30, 2003 ((Myers Aff., ¶ 20), when Ms. Rivera indicated that her problems with him had been resolved. (Mulqueen Decl., ¶ 14). The Commission maintains that until that time Ms. Rivera continued to feel intimidated by Mr. Myers and that it made the decision to keep him on the tenth floor to avoid

further disruption.  (Mulqueen Decl., ¶¶ 17-18).[3]  In fact, the
plaintiff did experience additional difficulties with Ms. Rivera
after the April 16, 2002, incident, but the details are not
directly relevant to this matter.[4]

       B.    The Dark Glasses and the Subsequent Suspension

       In March 2003, Mr. Myers began wearing dark, tinted glasses to
work and to his interviews with members of the public.  (Def. 56.1
Statement, ¶ 20).  Although there is no evidence of complaints by
the individuals who met with the plaintiff, the Commission informed
him that it was inappropriate to wear the dark glasses during
interviews and that, to continue doing so, he would be required to
provide documentation showing medical necessity.  (Def. Exh. M-1).
The plaintiff responded that his tinted glasses reduced the harsh
glare from the overhead lights and computer monitor, and he

_____

       [3]    Mr. Mulqueen's declaration is admissible to establish the
reasons behind the Commission's actions, but it cannot support Ms.
Rivera's version of the events.

       [4]    On April 1, 2003, the plaintiff reported a third incident
with Ms. Rivera.  He allegedly stepped out of an elevator she was
entering to avoid any conflict with her.  (Def. Exh. H).  She then
allegedly made comments that the plaintiff "could not understand"
but "struck [him] as somewhat sinister in nature."  (Def. Exh. H).
The plaintiff "conclud[ed] from this incident that [Ms. Rivera had]
a real problem, either psychologically or emotionally," and she
"apparently [] decided to direct her problematic attitude toward
[the plaintiff]."  (Def. Exh. H).

       On July 5, 2002, the plaintiff filed a report regarding Ms.
Rivera with the local police precinct, as well as with a mediation
and conflict resolution agency .  (Plaintiff's Memorandum of Law in
Opposition to Motion for Summary Judgment ("Pl. Memo.") at 4).

provided a doctor's note stating, "Mr. Myers may wear his tinted glasses in the office for medical reasons." (Def. Exhs. M-2, M-3). The Commission informed the plaintiff that this note was insufficient because it failed to explain the medical necessity for the glasses. (Def. Exhs. M—1, M-4, M—7; Mulqueen Decl., ¶ 17). The Commission directed the plaintiff not to wear the glasses at work until he provided sufficient medical documentation, but he nevertheless continued wearing them. (Def. Exhs. M-5, M—6, M-7, M—9).

On June 10, 2003, the plaintiff submitted a request for leave to attend a medical appointment that day, and he left before determining if his request had been granted. (Def. Exh. O at 2; Mulqueen Decl., ¶ 18). The request was subsequently denied because it did not comply with the Commission's 24-hour notice requirement for scheduled absences. (Def. Exh. J; Mulqueen Decl., ¶ 18). Mr. Myers arrived late to work on June 11, 12, and 13, 2003. (Def. Exh. L at 2). On June 26, 2003, he again requested leave without providing the required 24-hour notice and again left without obtaining prior approval. (Def. Exh. O at 3-4). The plaintiff's July 2, 2003, request for leave on July 7 and 8, 2003 was granted. (Myers Aff., ¶ 14; Mulqueen Decl., ¶ 19). The Commission claims that this request was granted only with the caveat that Mr. Myers attend a disciplinary meeting on July 8, 2003. (Mulqueen Decl., ¶ 19). The plaintiff asserts that he had no knowledge of this

proviso (Myers Aff., ¶ 14), and no documentary evidence of such a condition has been submitted to the Court. The plaintiff did not attend the disciplinary meeting. (Def. 56.1 Statement, ¶ 31).

On July 9, 2003, the Commission served the plaintiff with notice of an informal conference on July 22, 2003, and suspended him without pay for 30 days. (Def. Exh. K; Myers Aff., ¶ 15; Mulqueen Decl., ¶ 20). When Mr. Mulqueen attempted to serve Mr. Myers with the formal charges and suspension notice, Mr. Mulqueen and Mr. Myers had a confrontation. (Myers Aff., ¶ 15; Mulqueen Decl., ¶ 21). Mr. Mulqueen alleges that the plaintiff ignored him, refused to hang up the telephone despite a request to do so, and "moved within inches of [him] in an attempt to intimidate and physically menace [him]." (Mulqueen Decl., ¶ 21). He admits that the plaintiff eventually complied with his request to step back but alleges that the plaintiff refused to accept the documents. (Mulqueen Decl., ¶ 21). Mr. Myers contests this characterization of the events, claiming that Mr. Mulqueen physically blocked his way and shouted, "That's it, you're out of here!". (Myers Aff., ¶ 15).[5]

The plaintiff appeared at the July 22, 2003, informal conference and was represented by an attorney and union officials.

_____

[5] An impartial arbitrator did not credit the plaintiff's version of the incident. (Opinion and Award dated August 24, 2005, attached as Exhibit E to Affirmation of Spencer G. Gibbs dated Sept. 28, 2005 ("Gibbs Aff.")).

(Def. Exh. L).  He was charged with misconduct consisting of (1) continuing to wear dark glasses in the office and with members of the public without providing medical documentation of the  need to do so, and without offering any explanation for the failure to provide appropriate medical documentation; (2) failing to provide the requisite 24-hour notice for leave taken on June 10 and 26, 2003; (3) taking leave on July 7 and 8, 2003, but failing to report to the July 8, 2003, disciplinary meeting; and (4) behaving in an intimidating and disrespectful manner towards Mr. Mulqueen at the time of service of the charges.  (Def. Exhs. K, L).  On July 28, 2003, the Hearing Officer issued a recommendation that the plaintiff be suspended without pay for 30 days, stating that the charges "taken together constitute a pattern of willful insubordination."  (Def. Exh. L at 3).

The plaintiff returned to work on August 15, 2003.  On August 27, he submitted a memorandum formally requesting the reasonable accommodation of wearing tinted glasses, along with an optometrist's letter recommending he wear the glasses on the basis that an August 2, 2003, eye exam "revealed mild evidence that might associate with his complaint of light sensitivity." (Def. Exh. N at 1, 2; Myers Aff., ¶ 19).  On September 9, 2003, the Commission granted this request.  (Def. Exh. N at 3).

The plaintiff filed a complaint with the United States Equal Employment Opportunity Commission (the "EEOC") in the fall of 2003,

and he received a right-to-sue letter on October 24, 2003.  (Def. Exhs. A, B; Rothschild Decl., ¶ 3).  Mr. Myers was returned to a workspace on the ninth floor on October 30, 2003.  (Def. Exh. C at 4; Myers Aff., ¶ 20).  On November 8, 2003, the plaintiff's supervisor completed a written evaluation of his performance during the period of October 18, 2002, through October 18, 2003, giving the plaintiff an "overall rating" of "very good" and making no mention of any of the problems described above.  (Def. Exh. P at 21-26).

Discussion

Mr. Myers alleges that the Commission made decisions concerning his employment on the basis of disability and race.  He asserts that he suffers from acute light sensitivity, which substantially limits his ability to see, and that the Commission's refusal to permit him to wear tinted glasses in the workplace prior to September 2003 constituted a failure to provide a reasonable accommodation.  He further alleges that the Commission suspended him for 30 days in retaliation for wearing the dark glasses that aided his sight.  The Commission responds that Mr. Myers is not disabled, as he is virtually unimpaired when he wears his dark glasses, and, with respect to the retaliation claim, wearing the glasses is not statutorily-protected activity.  The Commission is correct on both counts.

Mr. Myers also raises three race discrimination claims.

9

First, he challenges his relocation to the tenth floor, arguing that it constituted disparate treatment on the basis of race. Second, he asserts that the Commission required him to remain in that location in retaliation for his participation in the April 2002 informal conference concerning his altercation with Ms. Rivera. Finally, the plaintiff claims that the Commission maintained a racially hostile work environment.

In response, the Commission explains that it ordered Mr. Myers to move his workstation to the tenth floor to separate him from Ms. Rivera, with whom he had experienced conflicts, and that certain aspects of Ms. Rivera's job responsibilities would have made relocating her a more costly proposition. The Commission also argues that participation in a disciplinary proceeding is not included within the definition of statutorily-protected activity under Title VII. Finally, the Commission maintains that the record reflects no evidence of a racially hostile work environment. Again, the Commission is entitled to summary judgment.

A. Standard for Summary Judgement

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Marvel

Characters, Inc. v. Simon, 310 F.3d 280, 285-86 (2d Cir. 2002).
The moving party bears the initial burden of demonstrating the
absence of any genuine issue of material fact. Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 256 (1986). Where the moving party
meets that burden, the opposing party must come forward with
specific evidence demonstrating the existence of a genuine dispute
concerning material facts. Fed. R. Civ. P. 56(c); Anderson, 477
U.S. at 249. In assessing the record to determine whether there is
a genuine issue of a material fact, the court must resolve all
ambiguities and draw all factual inferences in favor of the
nonmoving party. Anderson, 477 U.S. at 255 (citing Adickes v. S.
H. Press & Co., 398 U.S. 144, 158-59 (1970)).

Special caution should be exercised when granting summary
judgment in employment discrimination cases:

> [W]hen deciding whether this drastic provisional remedy
> should be granted in a discrimination case, additional
> considerations should be taken into account. A trial
> court must be cautious about granting summary judgment to
> an employer when, as here, its intent is at issue.
> Because writings directly supporting a claim of
> intentional discrimination are rarely, if ever, found
> among an employer's corporate papers, affidavits and
> depositions must be carefully scrutinized for
> circumstantial proof which, if believed, would show
> discrimination. Finally, the trial court's task at the
> summary judgment motion stage of the litigation is
> carefully limited to discerning whether there are any
> genuine issues of material fact to be tried, not to
> deciding them. Its duty, in short, is confined at this
> point to issue-finding; it does not extend to issue-
> resolution.

Gallo v. Prudential Residential Services, L.P., 22 F.3d 1219, 1224

(2d Cir. 1994) (internal citations omitted). Thus, where the nonmovant bears the ultimate burden to prove that the defendant discriminated, he may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. Montana v. First Federal Savings and Loan Association, 869 F.2d 100, 103 (2d Cir. 1989).

However, "[t]he litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." Podell v. Citicorp Diners Club, Inc., 112 F.3d 98, 101 (2d Cir. 1997) (citation and internal quotations omitted). Summary judgment must be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

B. ADA Claims

The plaintiff alleges that he is disabled and that the defendant failed to make a reasonable accommodation for his disability. The plaintiff further alleges that the defendant retaliated against him for engaging in activity protected by the ADA. Summary judgment must be granted to the defendant on both of these claims, as the plaintiff has failed to raise a genuine issue of material fact as to either one.

1. <u>Refusal to Permit Dark Glasses</u>

The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such an individual holds or desires." 42 U.S.C. § 12111(8). An employer's failure to provide a reasonable accommodation for a disability may constitute a discriminatory action. 42 U.S.C. § 12112(b)(5)(A); <u>see</u> <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 216 (2d Cir. 2001). The required accommodation may include "'adjustments to the work environment, or to the manner or circumstances under which [a] position . . . is customarily performed, that enable [the] qualified individual . . . to perform the essential functions of [his or her] position.'" <u>Lovejoy-Wilson</u>, 263 F.3d at 217 (quoting 29 C.F.R. § 1630.2(o)(1)(ii)). Mr. Myers asserts that his acute light sensitivity is a disability that requires the Commission to accommodate him by allowing him to wear tinted glasses in the workplace; he maintains that the defendant violated the ADA by failing to grant such permission.

Claims brought under the ADA are subject to the same burden-shifting framework that was established for Title VII cases in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). <u>Sarno v.</u>

Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.
1999).   The plaintiff therefore bears the initial burden of
establishing his prima facie case.  McDonnell Douglas, 411 U.S. at
802.  To establish a prima facie case of employment discrimination
under the ADA, the plaintiff must show that (1) his employer is
subject to the ADA; (2) the plaintiff suffers from a disability
within the meaning of the ADA; (3) he can perform the essential
functions of his job with or without reasonable accommodations; and
(4) he suffered an adverse employment action because of his
disability.  Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d
Cir. 1998); Giordano v. City of New York, 274 F.3d 740, 747 (2d
Cir. 2001).  A failure to accommodate will satisfy the "adverse
action" component.  42 U.S.C. § 12112(b)(5)(a).

     The fatal difficulty for Mr. Myers is the second prong of the
test. An individual will be found to suffer from a disability if
(1) he "has" a physical or mental impairment that substantially
limits a major life activity; (2) he "has a record of" such an
impairment; or (3) he "is regarded as" having such an impairment.
42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(j).  The plaintiff is not
disabled under any of these three definitions.

     First,  the  plaintiff  cannot  establish  that  he  has  a
disability.  Assuming for the sake of argument that the plaintiff's
photosensitivity  is  a  physical  impairment,  it  does  not
substantially limit any of his major life activities.  Major life

activities are defined as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i).  The plaintiff alleges that, if he does not wear the tinted lenses, his acute light sensitivity creates physical pain that severely restricts his ability to see.  (Def. Exh. M-3).

In <u>Sutton v. United Air Lines, Inc.</u>, 527 U.S. 471  (1999), the Supreme Court held that

> [a] 'disability' exists only where an impairment 'substantially limits' a major life activity, not where it 'might', 'could,' or 'would' be substantially limiting if corrective measures were not taken.  <u>A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity.</u>

<u>Id.</u> at 482-83 (emphasis added).  The Court concluded that severely myopic airline pilots were not disabled within the meaning of the ADA because their visual impairments could be corrected by eyeglasses or contact lenses.  <u>Id.</u> at 488-89.

The plaintiff in this case has admitted that wearing his tinted glasses "proved extremely helpful in reducing pain and allowing [him] to perform the duties of [his] job."  (Myers Aff., ¶ 10).  He does not allege that he is unable to see or unable to work when wearing the dark lenses.  Plaintiffs are not "to be evaluated in their hypothetical uncorrected state."  <u>Sutton</u>, 527 U.S. at 482.  While the plaintiff may be impaired, he does not have

a disability within the meaning of the ADA.

Second, the plaintiff cannot establish that he has a record of a disability. The definition of an individual with a disability under 42 U.S.C. § 12102(2)(B) is met "if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment." Colwell v. Suffolk County Police Department, 158 F.3d 635, 645 (2d Cir. 1998) (quoting 29 C.F.R. Pt. 1630, App.). "The record must be one that shows an impairment that satisfies the ADA." Colwell, 158 F.3d at 645.

There is no evidence that the defendant relied on, or even had knowledge of, any record of the plaintiff suffering from a substantially limiting impairment. On March 24, 2003, the plaintiff submitted to the defendant a note from Dr. Roman Dworecki, which stated that the plaintiff "may wear his tinted glasses in the workplace for medical reasons." (Def. Exh. M-2). On the same day, Mr. Myers submitted to the defendant a memorandum alleging that he needed to wear tinted glasses to reduce the glare of overhead lights, his computer monitor, and "other harsh glare related situations that are often encountered." (Def. Exh. M-3). Finally, on or about August 26, 2003, a date after all events relevant to the plaintiff's claims, the plaintiff provided the defendant with a letter from ocular disease resident Grace Wang, which explained that "exam findings revealed mild evidence that might associate with [the plaintiff's] complaint of light

sensitivity." (Def. Exh. N at 2). In the letter, Dr. Wang expressed her view, based entirely on conversations with the plaintiff, that he "was very bothered by light even under normal room illumination until he started wearing tinted glasses." (Def. Exh. N at 2). None of this documentation suggests that Mr. Myers's impairment substantially limited either his ability to see or any of his other major life activities. On the contrary, the statement of Dr. Wang indicated that Mr. Myers's visual impairment was corrected by tinted lenses. Under Sutton, therefore, Mr. Myers is not disabled. See Sutton, 527 U.S. at 482-83. The plaintiff has presented no evidence of a record of disability known or unknown to the defendant, and he cannot maintain that he has a record of a disability within the meaning of the ADA.

Finally, the plaintiff cannot establish that the Commission regarded him as being disabled. There are two ways in which an individual may be "regarded as having" a disability: "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S. at 489 (emphasis added); accord E.E.O.C. v. J.B. Hunt Transport, Inc., 321 F.3d 69, 74 (2d Cir. 2003).

Under either definition, the Commission did not and does not regard the plaintiff as disabled. There is absolutely no evidence

in the record, nor does the plaintiff allege any facts to suggest, that the defendant is under a mistaken impression that Mr. Myers suffers from a substantially limiting impairment.

The plaintiff argues that the Commission must have regarded him as disabled because it eventually granted his request for a reasonable accommodation and authorized him to wear tinted glasses in the workplace. (Pl. Memo. at 12.) However, providing a benefit to an employee is not equivalent to conceding that the employee has a legal right to that benefit. It was logically consistent, and perhaps a good personnel decision, for the Commission to determine that, regardless of whether Mr. Myers was disabled, permitting him to wear tinted glasses would foster a professional work environment free of conflict.

Because the plaintiff is not disabled, he is unable to establish his prima facie case of disability discrimination. Summary judgment is therefore granted to the defendant on Mr. Myers's claim that he was denied a reasonable accommodation.

### 2. Suspension

The ADA prohibits discrimination "against any individual because such individual . . . opposed any act or practice made an unlawful by [the ADA] or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [the ADA]." 42 U.S.C. 12203(a).

> To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1)

the employee was engaged in an activity protected
by the ADA, (2) the employer was aware of that
activity, (3) an employment action adverse to the
plaintiff occurred, and (4) there existed a causal
connection between the protected activity and the
adverse employment action.

Weissman v. Dawn Joy Fashions, Inc., 214 F.3d 224, 234 (2d Cir.

2000) (quoting Sarno, 183 F.3d at 159).

Mr. Myers claims that in July 2003 the Commission suspended

him without pay for 30 days based on his refusal to cease wearing

tinted glasses in the workplace.  (Complaint, ¶ 5).  He asserts

that his employer violated the ADA by imposing the suspension in

retaliation for his wearing dark glasses.  Although he does not

state it directly, the plaintiff implies that the wearing of the

dark glasses constituted activity protected by the ADA.  This is

incorrect.

"The term 'protected activity' refers to action taken to

protest or oppose statutorily-prohibited discrimination." Cruz v.

Coach Stores, Inc., 202 F.3d 560, 566 (2d Cir. 2000) (citations

omitted).  Opposition to an unlawful employment practice may be

informal and can include "making complaints to management, writing

critical letters to customers, protesting against discrimination by

[an] industry or by society in general, and expressing support of

co-workers who have filed formal charges." Sumner v. United States

Postal Service, 899 F.2d 203, 209 (2d Cir. 1990).  Further, "a

plaintiff need not establish that the conduct he opposed was

actually a violation of the statute so long as he can establish

that he possessed a good faith reasonable belief that the underlying challenged actions of the employer violated [the ADA]." Sarno, 183 F.3d at 159 (quotation marks and citations omitted); accord Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002). Although, as discussed above, the plaintiff is not disabled and the wearing of dark glasses does not qualify as a reasonable accommodation in this case, he could still state a claim for retaliation if he took action to protest practices he reasonably believed to be discriminatory. See Keating v. Gaffney, 182 F. Supp. 2d 278, 288 (E.D.N.Y. 2001).

However, I need not reach the question of whether wearing dark glasses might, in some circumstances, be protected activity under the retaliation provisions of anti-discrimination statutes, see Cruz, 202 F.3d at 567, because Mr. Myers has not asserted that he wore the glasses in protest. The plaintiff alleges simply that he wore the glasses because they made him more comfortable and improved his sight. (Myers Aff., ¶ 10). As he has not made any showing that the wearing of the glasses was intended to, or did, express opposition to a discriminatory practice, he cannot show that he was retaliated against for engaging in statutorily-protected activity, and summary judgment must be granted to the defendant on the plaintiff's claim of retaliation under the ADA.

C. Race Discrimination Claims

The plaintiff claims that the defendant discriminated against

him on the basis of race in violation of Title VII.  The Commission required the plaintiff to move his workstation from the ninth to the tenth floor of the Commission's offices on April 17, 2002, and it did not permit him to return to the tenth floor until the following October.  (Myers Aff., ¶ 20).  The plaintiff claims that this constituted disparate treatment on the basis of race.  The plaintiff also claims that he was required to remain on the tenth floor in retaliation for engaging in activity protected under Title VII, specifically for successfully defending himself in an informal conference on April 26, 2002.  Finally, the plaintiff asserts that his employer has maintained a racially hostile work environment. All of these arguments are without merit, and summary judgment must be granted to the defendant on the plaintiff's race discrimination claims.

### 1.   Relocation

#### a.   Relocation as Disparate Treatment

Claims of discrimination under Title VII are analyzed in accordance with the three-part framework established in McDonnell Douglas Corp., 411 U.S. at 801-02.  In the first stage of the McDonnell Douglas analysis, the plaintiff must establish a prima facie case of racial discrimination by showing that (1) he is within a protected group, (2) he was qualified for the job at issue, (3) he was subject to an adverse employment action, and (4) this action occurred under circumstances giving rise to an

inference of discrimination.  Id. at 802.  Because an employer engaged in discrimination is unlikely to leave a "smoking gun," Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994), a plaintiff may usually rely on "the cumulative weight of circumstantial evidence" when proving bias.  Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir. 1991); see Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999) ("careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination").

If the plaintiff establishes the prima facie case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the employer's action.  McDonnell Douglas, 411 U.S. at 802.  Despite this shift of the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981); accord  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).

If the defendant does articulate a legitimate, nondiscriminatory reason for its action, the "plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."  Burdine, 450

U.S. at 253.  A plaintiff opposing a motion for summary judgment "must produce sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false," Woroski v. Nashua Corp., 31 F.3d 105, 110 (2d Cir. 1994), and "that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern v. Trustees of Columbia University, 131 F.3d 305, 312 (2d Cir. 1997).

The plaintiff has made a sufficient showing regarding the first two elements of his prima facie case.  As an African American and Native American man asserting discrimination on the basis of race, he is a member of a protected group.  The fact that he was hired, has continued to be employed, and has received satisfactory evaluations demonstrates that he is qualified.

It is less clear that Mr. Mr. Myers has satisfied the third prong of his prima facie case.  Title VII makes it unlawful for an employer "to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1).  Although the statutory language includes no reference to the prerequisite of demonstrating an "adverse employment action," courts have adopted this requirement to assist with defining the "terms" and

"conditions" of employment. An "employer can make [a] job undesirable without affecting money or benefits." Wanamaker v. Columbian Rope Co., 108 F.3d 462, 466 (2d Cir. 1997) (citing Collins v. State of Illinois, 830 F.2d 692, 703 (7th Cir. 1987)).

The employer's behavior constitutes an adverse employment action where the employee experiences "a materially adverse change in the terms and conditions of employment." Galabaya v. New York City Board of Education, 202 F.3d 636, 640 (2d Cir. 2000) (internal citations and quotation marks omitted).

> To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. [It] might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation.

Id. (internal citations and quotation marks omitted). "Because there are no bright-line rules, courts must pore over each case to determine whether the challenged employment action reaches the level of "adverse." Wanamaker, 108 F.3d at 466.

Mr. Myers alleges that his transfer from the ninth to the tenth floor constituted an adverse employment action. He alleges that his workplace on the tenth floor was isolated and located in a room with unusually harsh lighting.[6] The Second Circuit has not

---

[6] The plaintiff also asserts in his affidavit that he was deprived of the opportunity to interview claimants from April 17, 2002, through October 30, 2002 (Myers Aff., ¶ 3), but this salient

directly ruled on the question of whether a change in office space may constitute an adverse employment action. See Wanamaker, 108 F.3d at 466-67 ("the loss of an office and phone by an employee who has already been informed of a termination decision, and is waiting out his numbered days on the payroll searching for a new job, does not, in and of itself, amount to adverse employment action"). In at least two cases, lower courts have explicitly ruled that workspace reassignments did qualify as adverse employment actions. In Pellei v. International Planned Parenthood Federation, No. 96 Civ. 7014, 1999 WL 787753 at *12-13 (S.D.N.Y. 1999), the court found that the plaintiff's reassignment to a "small, poorly lit, isolated cubicle" constituted an adverse employment action, and in Scafidi v. Baldwin Union Free School District, 295 F. Supp. 2d 235, 239 (E.D.N.Y. 2003), the court held that in "liberally construing [the plaintiff's] claims," relocation to an office that "could be accessed only by a long flight of stairs, which 'forced' [the plaintiff] to carry [] testing supplies up a stairwell [and aggravate a] disability" qualified as an adverse employment action.

_____

fact is not mentioned in the EEOC Complaint or the Complaint filed with this Court, at any point in his attorney's submissions, or in his own handwritten chronology of the events (Def. Exh. C). Where an employee has been stripped of job responsibilities, it may significantly alter a court's analysis of whether an adverse action has occurred. However, because I will assume without deciding that an adverse action did occur in this case, it is not necessary to discuss further whether the plaintiff actually intended to maintain that the defendant altered his job responsibilities or how this would have affected the merits of his claim.

I will assume for purposes of this motion that Mr. Myers's workplace relocation constituted an adverse employment action.[7]

Finally, turning to the fourth prong and reading the complaint in the most liberal light possible, I will assume that Mr. Myers and the co-worker with whom he had a dispute are members of different races[8] and that relocating him while allowing her to remain undisturbed "would be sufficient to permit a rational trier of fact to infer a discriminatory motive." Chambers, 43 F.3d at 38. This assumption satisfies the fourth prong of the plaintiff's prima facie case of employment discrimination.

Although I have assumed that the plaintiff has established his prima facie case, the defendant has met its burden of articulating a nondiscriminatory reason for the decision to relocate him. The Commission has submitted evidence that it did so to separate Mr. Myers from a co-worker with whom he had experienced conflicts, including at least one incident that involved an alleged assault. (Mulqueen Decl., ¶¶ 5-7, 9-10, 14; Def. Exhs. D, E, F, and G). The plaintiff admits that he had a history of difficulty with the co-

---

[7] In cases where the plaintiff's prima facie case was otherwise flawed, other lower courts have assumed that a workspace reassignment did constitute an adverse employment action. See Marks v. New York University, 61 F. Supp. 2d 81, 95 (S.D.N.Y. 1999); Jordan v. Cayuga County, No. 5:01CV1037, 2004 WL 437459 at *6 (N.D.N.Y. 2004).

[8] The plaintiff was not alleged nor submitted evidence suggesting that Ms. Rivera is of a different race than he, but that appears to be his implication.

worker, Sol Rivera. (Def. Exhs. F, H; Myers Aff., ¶¶ 5, 8). He does not dispute that the defendant instructed him to relocate on April 17, 2002, the day after an incident with Ms. Rivera, and he admits that the instructions were given in the context of a discussion of that incident. (Myers Aff., ¶¶ 5-6). The Commission maintains that the relocation was ordered to prevent continuing discord in the workplace. It alleges that relocating Ms. Rivera's workstation would have been particularly difficult to arrange, because she functions as the Commission's liaison with the EEOC, and her computer is connected to special telephone lines that she requires to share information with the EEOC. (Mulqueen Decl., ¶ 9).

The plaintiff counters that Ms. Rivera was not serving as the EEOC liaison at the time of the April 16, 2002, incident. (Myers Aff., ¶ 7). However, the only evidence submitted in support of this contention is Mr. Myers's own affidavit, which provides no explanation of how he formulated his belief concerning Ms. Rivera's position. (Myers Aff., ¶ 7). He has referred to no document that he reviewed nor conversation that he witnessed before concluding that Ms. Rivera was not the EEOC liaison during the relevant period. In contrast, the Commission has provided the affirmation of Mr. Mulqueen, Deputy Commissioner and General Counsel to the Commission, who benefits from access to and familiarity with the records of employees of the Commission, and who has represented

that Ms. Rivera was the EEOC liaison during the relevant time period and that moving her work station would have created additional expense for the Commission. (Mulqueen Decl., ¶¶ 1, 9). This evidence satisfies the defendant's burden of articulating a non-discriminatory reason for its action.

Further, the plaintiff has submitted no evidence that the "defendant's employment decision was more likely than not based in whole or in part on discrimination." <u>Stern</u>, 131 F.3d at 312. When the Commission charged the plaintiff with misconduct due to the April 16, 2002, incident, Mr. Myers objected to the Commission's failure to "obtain facts and have facts objectively weighed." His answer, which he submitted one day after his relocation to the tenth floor, made no mention of any racial bias on the part of the Commission. (Def. Exh. E). Nothing in the record suggests that the plaintiff was relocated due to any racial motive, nor for any reason other than that articulated by the defendant. Even if it were established that Mr. Myers and Ms. Rivera are of different races, that fact would not be sufficient to overcome the defendant's evidence of a non-discriminatory motive and to demonstrate that the plaintiff was in fact relocated because of his race.

### b. <u>Relocation as Retaliation</u>

To establish a prima facie case of retaliation under Title VII, the plaintiff must show "(1) participation in a protected

activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." McMenemy v. City of Rochester, 241 F.3d 279, 282-83 (2d Cir. 2001). Once the plaintiff makes this showing, the burden of production shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. Holt v. KMI-Continental, Inc., 95 F.3d 123, 130 (2d Cir. 1996). If the defendant states such a reason, the burden shifts back to the plaintiff to provide evidence that the defendant's profferred reason was merely pretextual and that the action was actually motivated by the intention to retaliate. Id.

The plaintiff cannot satisfy the first prong of his prima facie case of retaliation. The plaintiff alleges that the defendant relocated the plaintiff's work space on April 17, 2002, in retaliation for his defending himself in an informal conference on April 26, 2002. Aside from the obvious chronological flaw with this argument, participation in this conference does not constitute activity protected by 42 U.S.C. § 2000e-3(a).

The relevant subsection of Title VII, entitled "Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings," forbids an employer from "discriminat[ing] against any of his employees . . . because [the employee] has . . . made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 2000e-3(a). The April 26, 2002, event in which the plaintiff participated was a conference concerning his alleged physical assault of a co-worker. (Def. Exhs. D, E, G). There is no evidence that allegations of discrimination were even alluded to at the conference. This does not constitute participation in a Title VII investigation or proceeding, and it cannot serve as the basis for a retaliation claim.

### 2.  Hostile Work Environment

The plaintiff also claims that his employer has subjected him to a racially discriminatory, hostile work environment. Title VII "is not limited to economic or tangible discrimination." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). Rather, it is intended "to strike at the entire spectrum of disparate treatment . . . which includes requiring people to work in a discriminatorily hostile or abusive environment." Id. (internal quotation marks and citations omitted). However, Title VII only bars discrimination with respect to "compensation, terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Accordingly, for harassment to be actionable, "it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Savings Bank, FSB v. Vinson, 477

U.S. 57, 67 (1986) (internal quotation marks, citation, and brackets omitted).

"[T]he plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of [his] working environment." Cruz, 202 F.3d at 570 (internal quotation marks and citations omitted). Factors to be considered in determining whether a work environment is hostile include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23.

There is absolutely no evidence in the record of discriminatory comments or behavior towards the plaintiff. The plaintiff argues that Deputy Commissioners Clifford Mulqueen and Randolph Wills were unresponsive to an audit by the New York City Equal Employment Practices Commission (the "EEPC"). (Pl. Memo. at 16-17). The evidence submitted in support of this claim appears to show that the EEPC requested that the Commission update its paperwork and conduct more frequent trainings on discrimination; the documentation from the EEPC in no way suggests that the plaintiff's supervisors or co-workers behaved in a discriminatory fashion towards the plaintiff or any other employee. (Letter from Equal Employment Practices Commission to Commissioner Patricia L.

Gatling dated Nov. 30, 2004, attached as Exh. H to Gibbs Aff.).
The plaintiff also asserts that the "tempers of Mulqueen and Wills
became so inflamed as a result of their interaction with plaintiff"
as to suggest racial bias in their perceptions of him. (Pl. Memo.
at 17). The mere fact that his supervisors may have raised their
voices on one or two occasions is wholly insufficient for a
reasonable jury to infer that racial animus is the explanation for
their behavior, particularly given that they understood that Mr.
Myers had harassed or assaulted a co-worker, behaved in a rude and
threatening manner towards a supervisor, taken leave without
permission, reported late to work, and disregarded orders to
refrain from wearing dark glasses unless he could provide medical
documentation of a need for them. Nothing in the record approaches
the level of misconduct required to state a claim of racial
harassment.

## Conclusion

For the reasons discussed, the defendant's motion for summary
judgment is granted in its entirety. The Clerk of Court shall
enter judgment dismissing the complaint and close the case.

SO ORDERED

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          February 15, 2006

32

Copies mailed this date:

Spencer C. Gibbs, Esq.
Rawlins & Gibbs, LLP
103 E. 125th Street, Rm 602
New York, New York 10035

Amy Rothschild, Esq.
Assistant Corporation Counsel
100 Church Street
New York, New York 10007